**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 25-cr-241-3 (TJK)** |
| **v.** | : | |
| | : | |
| **REGINALD LASSITER,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S**
**MOTION IN SUPPORT OF PRETRIAL RELEASE AND**
**APPEAL OF MAGISTRATE ORDER OF DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes Reginald Lassiter's (hereafter, the "defendant") Memorandum in Support of Pretrial Release to Home Confinement [ECF No. 30] and Appeal of Magistrate Order of Detention [ECF No. 31] (hereafter, the "Appeal"). As the Honorable G. Michael Harvey correctly found, there is no condition or combination of conditions that will reasonably assure the community's safety upon the defendant's release.

**PROCEDURAL HISTORY**

On August 21, 2025, a federal grand jury in Washington, D.C. returned an eight-count Indictment, charging the defendant and seven others in Count 1 with conspiring to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of phencyclidine ("PCP") and 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iv), (b)(1)(A)(vi), and 846. For his part, the quantity of narcotics reasonably foreseeable to the defendant as a member of the charged conspiracy is 400 grams or more of a mixture and substance containing a detectable amount of fentanyl. In Counts 3 through 7, the defendant is further charged

1

with unlawful distribution and possession with intent to distribute 40 grams or more of fentanyl and PCP pertaining to specific controlled buys conducted during the underlying investigation.

These charges stem from a year-long investigation into a narcotics trafficking conspiracy centered around the 2900 block of Knox Place SE, Washington, D.C.  Ultimately, the investigation culminated in a coordinated arrest operation on August 26, 2025, resulting in the seizure of 20 firearms; more than two kilograms, in aggregate, of powdered fentanyl, cocaine, and crack cocaine; significant quantities of liquid PCP; and approximately $50,000 in cash.

On August 27, 2025, during the defendant's initial appearance, the United States was granted its request for the defendant's pretrial detention, pursuant to 18 U.S.C. §§ 3142(f)(1)(B) (an offense carrying a maximum sentence of life imprisonment—specifically, 21 U.S.C. §§ 846, 841(b)(1)(A)(iv), and/or (b)(1)(A)(vi)); and (f)(1)(C) (serious drug felony).

On September 2, 2025, Magistrate Judge Harvey presided over a detention hearing for the defendant and his codefendants Thomas Hancock (hereafter, "Hancock"), Eric Prather (hereafter, "Prather"), and Darryl Riley (hereafter, "Riley").  At the outset, codefendant Hancock conceded detention.  After hearing the parties' arguments, Magistrate Judge Harvey ordered detention for the remaining defendants.

In outlining his ruling, Magistrate Judge Harvey acknowledged the defendant presented a challenging case given his history and characteristics, including his employment and educational history and community support.  In Magistrate Judge Harvey's view, those characteristics rebutted the rebuttable presumption applicable to the defendant under 18 U.S.C. § 3142(e)(3)(A), but the factors enumerated in 18 U.S.C. § 3142(g) nevertheless weighed in favor of the defendant's detention, as detailed below.

## SUMMARY OF INVESTIGATION

The indictment in the instant matter pertains to a narcotics trafficking conspiracy centered around the 2900 block of Knox Place SE, which is adjacent to the Woodland Terrace neighborhood of Southeast D.C. and the scene of increased violence in the past year, including approximately five homicides. From August 2024 to July 2025, undercover officers conducted approximately 20 controlled purchases, either in the 2900 block of Knox Place SE, or in other D.C. locations chosen by Knox Place traffickers. Over the course of these controlled purchases, eighteen of which were conducted with Eric Prather, law enforcement purchased approximately 1.8 kilograms of PCP and 900 grams of fentanyl.

Through various investigative methods, including court-authorized Title III wiretaps of Prather (Target Telephone 1, or TT1), Hancock (Target Telephone 2, or TT2), and Riley's (Target Telephone 3, or TT3) telephones over the first half of 2025,[1] investigative agents identified the sourcing of the narcotics sold in and around Knox Place.

Specifically, law enforcement identified the defendant as Prather's intermediate fentanyl source of supply; the defendant, in turn, obtained fentanyl from Hancock, a Baltimore-based drug trafficker. Additionally, TT1 wire intercepts, among other tools, revealed the defendant comanaged with Prather one of the primary stash locations uncovered in this investigation, located at 2926 Knox Place SE.

## APPLICABLE LAW

Pursuant to 18 U.S.C. § 3142(e)(3)(A), the defendant faces a rebuttable presumption that no condition or combinations of conditions can effectively protect the community.

---

[1] The Honorable Randolph D. Moss authorized the interception of wire communications for TT1, TT2, and TT3, in case numbers 25-wt-01 and 25-wt-02.

In considering whether there are conditions of release, which will reasonably assure the safety of any other person and the community, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). In consideration of these factors, along with the applicable rebuttable presumption, the United States respectfully submits that the defendant's release poses an unmitigable risk to the safety of the community.

## FACTUAL BACKGROUND

Since at least July 2024, Prather was a prolific drug dealer fueling an open-air drug market in the 2900 block of Knox Place in Southeast D.C., which he mobilized with the integral assistance of his coconspirators, chief among them, the defendant. Between August 28, 2024, and July 15, 2025, law enforcement conducted twenty controlled purchases—eighteen from Prather, and two from his associate, Rawlings.[2] The chart below details each controlled purchase, reflecting Prather's total sale of 905 grams of fentanyl and 1,797 grams of PCP, just to the undercover officer (hereafter, "UC").[3]

| Date | Substance | Weight (g) | Price | Seller |
|---|---|---|---|---|
| 08/28/2024 | Fentanyl | 9.934 | $800 | Prather |
| 09/05/2024 | Fentanyl | 9.998 | $800 | Prather |
| 09/11/2024 | Fentanyl | 9.016 | $1,600 | Prather |
| 09/11/2024 | Fentanyl | 13.654 | N/A | Prather |
| 09/25/2024 | Fentanyl | 26.86 | $1,960 | Prather |
| 10/03/2024 | Fentanyl | 27.51 | $1,960 | Prather |
|  | PCP | 0.932 | $20 |  |
| 10/15/2024 | Fentanyl | 26.53 | $1,960 | Prather |

[2] Coconspirators Melvina Rawlings and Gerrika Missouri are charged by criminal complaint in 25-mj-181.

[3] The UC was pretending to be a redistributor purchasing bulk quantities of narcotics for sale to his own customers.

| | | | | |
|---|---|---|---|---|
| **10/23/2024** | Fentanyl | 57.60 | $3,820 | Prather |
| **10/31/2024** | Fentanyl<br>PCP | 56.29<br>52.24 | $3,920<br>$500 | Prather |
| **11/12/2024** | Fentanyl<br>PCP | 83.61<br>102.02 | $5,040<br>$600 | Prather |
| **11/20/2024** | Fentanyl<br>PCP | 83.73<br>80.484 | $5,040<br>$600 | Prather |
| **12/03/2024** | Fentanyl<br>PCP | 83.49<br>86.485 | $5,040<br>$600 | Prather |
| **12/18/2024** | Fentanyl<br>PCP | 83.93<br>81.896 | $5,040<br>$600 | Prather |
| **01/08/2025** | Fentanyl<br>PCP | 83.27<br>39.536 | $4,200<br>$400 | Prather |
| **01/08/2025** | PCP | 36.712 | $300 | Prather |
| **02/11/2025** | Fentanyl<br>PCP | 27.98<br>169.44 | $1,200<br>$1,800 | Prather |
| **02/26/2025** | Fentanyl<br>PCP | 83.75<br>120.726 | $3,600<br>$300 | Prather |
| **03/27/2025** | Fentanyl<br>PCP | 82.46<br>358.648 | $2,400<br>$3,600 | Prather |
| **06/12/2025** | PCP | 8.472 | $140 | Rawlings |
| **06/17/2025** | Fentanyl<br>PCP | 0.569<br>9.884 | $0<br>$160 | Rawlings |
| **06/24/2025** | Fentanyl<br>PCP | 28.55<br>333.938 | $1,250<br>$2,400 | Prather |
| **07/15/2024** | Fentanyl<br>PCP | 26.58<br>333.938 | $1,400<br>$2,400 | Prather |

Inevitably, this drug operation in the 2900 block of Knox Place SE, invited a rash of violent crime in the area.  Over the duration of the charged conspiracy, from July 2024 to the present, within 1,000 feet of 2926 Knox Place (where the defendant's and Prather's stash house was located), the following violent crimes occurred:  five homicides, four of which stemmed from gun violence; seventeen assaults with dangerous weapons, involving twelve firearms, five of which were fired; five robberies, all but two of which involved guns; and eight burglaries.  Of those, two homicides, five assaults with dangerous weapons, one robbery, and one burglary were committed within just 200 feet of 2926 Knox Place, and all but three (two assaults and one burglary) involved a gun.

### Indictment Counts 1 and 3 Through 7:  Charged Controlled Buys Involving the Defendant

*Counts 1 and 3:*  On October 23, the undercover officer ("UC") purchased approximately 57.60 grams of fentanyl from Prather. The following evidence shows the defendant supplied the fentanyl ultimately sold to the UC.

On October 22, following the typical pattern, the UC first placed an order for 56 grams of fentanyl, while also reminding Prather about the PCP he wanted to purchase, referring to it as the "Deer Park." Prather stated that the fentanyl was available for purchase, but he was still waiting for the PCP. The UC and Prather then agreed to meet at the Shops at Dakota Crossing, 2438 Market Street NE.

The morning of October 23, the defendant's cell site location information ("CSLI") showed him in the vicinity of Anthem House in Baltimore, Maryland—Hancock's residence and stash house, detailed *infra*—from approximately 8:02 a.m. to 8:25 a.m. before heading back to D.C. A surveilling officer observed the defendant leaving the front door of Hancock's trap house, the Anthem House, around 8:22 a.m., as shown below.

 

Call detail records ("CDR") further illustrated that Prather was again in communication with the defendant once the order was placed and leading up to the controlled purchase. Per CDR, the defendant and Prather communicated with one another approximately 21 times from 9:09 a.m. to 11:22 a.m. as the defendant traveled to D.C.  As shown below, prior to the defendant's arrival in D.C., surveillance observed the defendant around 9:41 a.m., at his Hill-Rom job site in Upper Marlboro, Maryland, with his Chevrolet Express work van (hereafter, the "Hill-Rom van").[4]



Meanwhile, as the defendant was traveling towards D.C., at 11:09 a.m., Prather called the UC, advising that he must first meet his man at Deanwood station. Sure enough, CSLI and pen register data support that the defendant and Prather met in the vicinity of Deanwood station around 11:21 a.m. before the controlled purchase occurred.

---

[4] This is a Chevrolet Express van with MD license plate 8AW9957, which is registered to the Hill-Rom company in Prince George's County, Maryland, where the defendant worked.  During the life of the conspiracy, the defendant has been observed driving this vehicle, particularly to the 2900 block of Knox Place to drop off narcotics to Prather.

Then, at 11:27 a.m., Prather called the UC on a recorded call via TT1. Prather stated that, "I'm right here by, damn, Deanwood I'm close to Deanwood station" and "I'm about to come now, I'm like 10 minutes away. I'll call you when I pull in the parking lot." The UC and Prather subsequently exchanged recorded calls to locate one another in the parking lot. Based on toll analysis and CSLI, the evidence supports the reasonable inference that Prather needed to meet his supplier— the defendant—prior to the controlled purchase. Only once Prather received his supply from the defendant, he was ready to complete the purchase with the UC.

_Counts 1 and 4_:  On November 12, 2024, the UC purchased approximately 83.61 grams of fentanyl and PCP weighing 272.45 grams with its packaging from Prather.  Once again, the defendant supplied Prather with the fentanyl sold to the UC.

Following the same pattern, the day prior, November 11, the UC called Prather to arrange the purchase, using the same coded language (the excerpted language refers to the PCP): "The Deer Park. Let me go ahead and get four, four um little bottles of the Deer Park. And then of course you, you going to put that other one in there." Prather confirmed, "Yeah. That's five."

Again, similar to prior controlled purchases, Prather coordinated with the defendant to fulfill part or all of the UC's order. On the morning of the contemplated purchase, November 12, 2024, physical and technical surveillance were initiated in the early morning hours. Court-authorized cellphone records of Prather's phone number ("TT1" or "Target Telephone 1") show voice communications between Prather and the defendant between 5:23 a.m. and 5:28 a.m.  At approximately 6:06 a.m., surveilling officers observed a black Ford Fusion in the parking lot across from 2926 Knox Place SE, bearing MD license plate 8AW9957 affixed to the front of the vehicle. Of note, that is the same license plate that was on the defendant's Hill-Rom Van.

At approximately 6:18 a.m., law enforcement observed through technical surveillance the Hill-Rom Van driven by the defendant, entering the parking lot across from 2926 Knox Place SE, Washington, D.C. While the Hill-Rom van was parked, the lights on the black Ford Fusion, visible with no rear license plate, flashed. Shortly thereafter, the driver of the Hill-Rom van—believed to be the defendant based on physical appearance and prior observations of him driving the Hill-Rom van—exited the van and opened the rear passenger door of the Ford Fusion, leaning inside the vehicle. The defendant then re-entered the Hill-Rom van and left the area in the van. The below image from technical surveillance captures the Hill-Rom van and the defendant entering the Ford Fusion. Circled in yellow is the defendant at the Ford Fusion, and circled in red is the Hill-Rom van parked nearby:



Physical surveillance observed the Hill-Rom van leaving the parking lot and confirmed it was the defendant's van bearing the tag 8AW9957, the same plate affixed to the front of the Ford Fusion referenced *supra*.

Tolls show three voice communications between Prather and the defendant, including an answered voice communication at 7:04 a.m.  Later in the day, law enforcement surveilled the

defendant at his job site, observing him wearing an outfit consistent with the outfit he was depicted wearing in the early morning hours, when he dropped off the supply in the Ford Fusion.



Tolls for Prather's TT1 show additional calls between Prather and the defendant, including an outgoing voice call at approximately 11:49 a.m. on the morning of November 12 to the defendant. Around 11:50 a.m., technical surveillance captured an individual who appeared to be Prather entering the front passenger seat of the Ford Fusion while talking on a cellphone, as reflected in the below screenshot.



CDR reflect that at the time Prather was observed on surveillance retrieving something from the Ford Fusion while on the phone, he was on an outgoing call to the defendant.  Prather then entered a burgundy GMC Yukon, which then left Knox Place around 11:51 a.m. to transport Prather to the buy location where he met the UC at 2350 South Dakota Avenue NE. After the UC paid, in total, $5,640 for the fentanyl and PCP, Prather departed.

*Counts 1 and 5*:  On February 5, 2025, the United States was authorized to commence intercepting Prather's TT1 wire communications on TT1 from February 5 to March 6, 2025.  On February 11, 2025, the first buy occurred after interceptions of TT1 commenced. The UC purchased from Prather approximately 28.83 grams of fentanyl, with packaging, and PCP weighing 444.85 grams in two glass bottles.  The intercepted communications combined with the controlled buy confirmed the defendant's role in the fentanyl supply and introduced Prather's PCP suppliers, Leonard Edwards (hereafter, "Edwards") and Darry Riley (hereafter, "Riley").

The day prior, the UC placed the order with Prather, requesting an ounce of fentanyl and eight ounces of light-colored PCP.  Intercepted communications after the UC's order, combined

with pole camera footage showing Edwards entering and leaving from the stash location at 2926 Knox Place SE, confirmed Edwards' role as the PCP supplier for this controlled buy.

As for the fentanyl component of the UC's order, Prather looked to the defendant to facilitate. At 7:18 pm on February 10, in Session 718, Prather called the defendant to confirm the defendant still had the "purple rain," a particular type of fentanyl powder that is lavender-hued, which is precisely what Prather ultimately sold to the UC during this buy, as shown below:



The defendant confirmed to Prather that he did have what was intended for the controlled purchase. The next morning, at approximately 8:23 am (TT1, Session 826), the defendant called Prather, who relayed his concern on police presence by the stash house. Consequently, Prather took his money and narcotics across the street ("Cuz I was scared…I grabbed all my money and got the fuck" and "I sent everything across the street."), likely referencing Missouri's residence at 2921 Knox Place SE. The defendant asked specifically about a small amount of narcotics he had left in a teapot; Prather confirmed that the teapot was also moved across the street. Prather began

to recall how much fentanyl he had ("I got one, over one cause it was jumping last night. And then two over there. I am going to take one with me" because "…my man is going to call me around 10…"). At 11:09 a.m., Prather then called Gerrika Missouri (TT1, Session 849), asking her to get "Darren," their tester,[5] a snack, referring to the contents of the teacup.

At approximately 11:30 a.m., the UC arrived at the buy location, 2470 Market Street NE, Washington, D.C. Approximately ten minutes later, Prather arrived along with an associate. At approximately 11:41 a.m., Prather entered the UC's vehicle and exchanged an orange reusable cloth bag containing what later proved to be purple-colored powdered fentanyl, two glass vials of PCP, laundry detergent, dryer sheets, and a cloth rag for a brown paper bag containing $3,000. Below is a still image (turned 90 degrees) of Prather inside the UC's vehicle. During the recorded buy, Prather told the UC they just tested the "purple rain," and the tester was high all night.



_Counts 1 and 6_:  On February 25, 2025, the UC called Prather at approximately 2:20 pm, asking Prather if "…you got the tools…"  Prather responded, "Nah. My man just got killed on

---

[5] Law enforcement identified through the investigation, including the intercepted communications, that Darren was an individual struggling with substance abuse addiction, who Prather, Lassiter, Hancock, Missouri, and the co-conspirators used as a guinea pig to test their product before selling to customers.

Friday.[6] Ain't nobody selling nothing right now." Prather later stated, "I still got your six in the car, too. So yeah, remember that." Later in the conversation, the UC requested three ounces of fentanyl at the usual price, $1,200, and eight ounces of the light-colored PCP. When the UC tried to confirm the price, Prather said he would do so once he got off the phone with the UC.

That evening, at approximately 8:25 pm (TT1, Session 3180), Prather called Hancock at Target Telephone 2, or "TT2."   During the call, an unknown male (suspected to be Riley but labeled as UM), used TT1 to speak with Hancock while Prather was audible in the background:

HANCOCK: Hello?

PRATHER: Cuh.

HANCOCK: Marbury.

UM: Yeah hello, this Black. This is Black.

HANCOCK: What's up bro.

UM: Man, he uh back rejuvenated. (Laughing)

HANCOCK: Oh he alright? That n**** wen't out huh?

UM: Yeah, I put the wa – I put that cold ass water on his neck. That n**** (mimicking noises). I'm like n**** *unintelligible*.

HANCOCK: Ah damn, that n**** was in a deep motherfucking, motherfucking coma just now.

UM: Maaan, I'm telling. I'm like aw nah. He *unintelligible*

HANCOCK: *unintelligible* should've put him in the trashcan.

UM: (Laughing)

PRATHER: (Singing in the background): Put that *unintelligible in the trash can.* Leave *unintelligible* at the door. I'm your trash.

---

[6] Prather is believed to be referencing a February 16, 2025 homicide in the 2900 block of Knox Place, SE, which is also the block in which Prather traffics narcotics.

UM: Alright, I just wanted to let you know cuh.

HANCOCK: Alright. Hey, ask him what that motherfucker do to him man.

UM: Alright.

PRATHER: He be, he, he be having amnesia when he come back. No bullshit.

In other words, Prather and "Black" (Riley) informed Hancock that the user who tested the narcotic was so intensely incapacitated, they were in a "coma[.]"

The next day, February 26, beginning at approximately 8:27 am, the UC and Prather exchanged phone calls to establish a meeting place, eventually settling on the Shell Gas Station at 2350 South Dakota Avenue NE. As the meeting was being finalized, Prather also coordinated with the defendant, beginning at 8:09 am (TT1, Session 3257):

PRATHER: Hello?

LASSITER: What's up cuz?

PRATHER: Hey, what time you coming down-

LASSITER: *unintelligible*

PRATHER: What time you coming down this way cuz.

LASSITER: (Talking to someone in the background) *unintelligible* nope, not working. Um, I'll probably can be on that side, um, I probably can leave out here by like 12. Why? What you need me to do?

PRATHER: Nah, that's my fault. I need three. That n**** didn't call me till like motherfucking 10 o'clock at night cuz.

LASSITER: Alright, damn. What time he say he coming?

PRATHER: Uh Uh. I probably can call him and tell him to meet me at, uh, 12 or one. Or whatever. One o'clock, two two o'clock, whatever.

LASSITER: Tell tell 'em, tell 'em tell. Tell him one. I'm about to leave out the warehouse probably like right now and then go to unintelligible.

PRATHER: and I'll have it for you as soon as you get there. Alright, I'll make sure.

LASSITER: Alright, I'm on my way.

PRATHER: Alright.

LASSITER: Alright.

Interpreted, Prather asked the defendant for three ounces of fentanyl, and the defendant responded that he could meet Prather after 12 pm from work, recommending that Prather schedule the UC meeting at 1 pm. At approximately 11:52 a.m., technical surveillance capturing the 2900 block of Knox Place SE recorded the defendant entering 2926 Knox Place SE. At approximately 12:30 p.m., the defendant exited 2926 Knox Place SE. Between this period, the defendant's Hill-Rom van was observed parked in the parking lot across from 2926 Knox Place SE.

Interwoven with these intercepted communications are the recorded conversations between the UC and Prather. At 8:27 am, Prather, via TT1, texted the UC, "I forgot bro you said you wanted dark or light[.]" At approximately 8:30 a.m., the UC made a recorded call to Prather via TT1, during which Prather asked, "What's up brother?  I ain't remember if it was, uh, dark or light cuz. I got both *unintelligibl*e right here." The UC confirmed, "Oh the light." Prather later stated, "Hey my cousin and them got a meeting, man. So it won't be like till one. That's cool?"  The UC stated, "Yeah, that's fine. I'll find something to do until then." This is consistent with the above-described timing articulated by the defendant.

Prather's intercepted TT1 communications revealed his attempts to procure the PCP supply from Edwards, who was unable to fulfill the order in time for the scheduled buy.  Prather therefore communicated with Riley to obtain the PCP prior to the controlled buy.  Prather and the UC ultimately met at the buy location, 2350 South Dakota Avenue NE, where Prather sold the UC approximately 83.75 grams of fentanyl and 120.73 grams of PCP.

*Counts 1 and 7*:  On March 26, 2025, at approximately 8:44 a.m., Prather, via TT1, placed an outgoing call to the defendant (TT1, Session 6414):

LASSITER: What's up cuz?

> PRATHER: Hey cuz. Uh, you got that that's only one that's inside the Benefiber uh package?
>
> LASSITER: That's probably like one and some change.
>
> PRATHER: Okay. What uh what time you was coming down this way?
>
> LASSITER: Oh. Tonight. What time you need to get it?
>
> PRATHER: Yeah, I need two more. I got the money for you and everything.
>
> LASSITER: Alright. I'ma see if Fresh bring one down. So you need one more outside of that one or two more?
>
> PRATHER: I need two more, so I need three. So that one and two.

In other words, Prather contacted the defendant for a resupply of fentanyl requested by the UC, but because the defendant was out of town, as corroborated by the defendant's CSLI, he would have Hancock, a/k/a "Fresh"[7] handle the supply.

The same day, at approximately 11:07 a.m., the UC placed a recorded call to Prather, via TT1. The call was intercepted (TT1, Session 6423) as well as verified by reference to the UC's phone's recording software log. Below are excerpts from the call:

> PRATHER: I couldn't get the um I couldn't get the uh light uh that's all they had was dark but that that's what I already had. I'll bring it with me just to show you what it look like. The shit that I got.
>
> UC: I mean it's all good. You got you got uh you got 16 of it, right?
>
> PRATHER: Nah, I have eight. They ain't have that much.
>
> UC: Oh you only got eight? Alright.
>
> PRATHER: Yeah.
>
> UC: Well I mean so that's gonna still be, um, 150 right?

---

[7] From Hancock's own intercepted TT2 calls in addition to the United States' review of his Cash App and iCloud returns, agents ascertained that Hancock's nickname is "Fresh."

PRATHER: Yeah, yeah. Look though-

UC: Alright I mean you still got, go ahead.

PRATHER: If I, if I get the other eight, I'll call you and let you know so I can bring it.

UC: So you got the you you gonna have the tre and everything right?

PRATHER: Oh yeah yeah I always got that.

UC: Alright well I mean you know I'm waiting I'm waiting on you whenever, how long how long?

PRATHER: I'm waiting for my cousin to, um, go on his lunch break.

This conversation reflects that Prather informed the UC that his PCP supplier only had eight ounces of PCP so he could not get the requested 16 ounces. Prather told the UC he had to wait on his "cousin," consistent with Prather's attempts to obtain the two ounces from the defendant and Hancock (TT1, Session 6414).

Then, at approximately 12:26 pm (TT1, Session 6427), Prather began trying to firm up the deal: Prather, via TT1, received an incoming call from the defendant. Below are excerpts from the conversation:

LASSITER: Yeah, Brodie said he gonna bring it up there to you.

PRATHER: Okay. You know what time he coming cuz?  I got the n**** waiting for me.

LASSITER: I do not know.

PRATHER: Okay text *unintelligible*

LASSITER: I'ma text you his number.

In other words, the defendant informed Prather that he spoke with his fentanyl supplier—later determined to be Hancock—who would deliver it to Prather at an unknown time.

At approximately 12:36 p.m. (TT1, Session 6428), Prather, via TT1, placed an outgoing call to Hancock at TT2. Below are excerpts from the conversation:

HANCOCK: Marbury.

PRATHER: What's up with you bro? Hey, what time you think your gonna be? *Unintelligible*

HANCOCK: What's up bro?

PRATHER: Nothing. Just chilling.

HANCOCK: Um.

PRATHER: Cause I got, I got the dude waiting for me.

HANCOCK: I can't say a time right now cause I'm actually waiting for my people uh out of town. I gotta pick up in the, from the airport in like probably 20, 30 more minutes. So.

PRATHER: Okay. Okay.

HANCOCK: Soon as I finish with them, and settle them, I'll hit you and say I'm coming down.

Approximately three hours later, at approximately 3:36 p.m., the UC placed a recorded call to Prather, via TT1.

UC: You forgot about me dawg?

PRATHER: I'm waiting for my man. Nah. Nah, I'm waiting for my man to bring me the shit cuz. I ain't forget about you.

UC: Aw man.

PRATHER: Yeah

UC: Well look um

PRATHER: Yeah

UC: Well yeah it's you wanna do it tomorrow then? I mean hopefully he come through tomorrow.

PRATHER: Nah nah he'll come through today, but I don't want to have you out there like that. So yeah, tomorrow would be better man and I apologize for for the shit man.

UC: Alright well can you see if um you can get that other eight then?

PRATHER: Yeah, I will. I have it, I have it.

UC: Alright yeah see if you can get the other eight in, alright yeah I'll I'll holler at you tomorrow.

In other words, the meet between Prather and the UC was rescheduled for the next day, March 27, 2025, and in the meantime, Prather would attempt to obtain eight more ounces of PCP.

Approximately an hour and nine minutes after the call with the UC, the defendant contacted Prather (TT1, Session 6452). During the call, the defendant asked, "Hey, did you talk to him?" Prather initially responded, "Yeah, I told the n**** tomorrow," but then added, "You talking about Fresh. Yeah, he said he don't know when he'll be down here. Sometime today." Interpreted, during this call, the defendant wanted to confirm Prather had talked with Hancock, a/k/a "Fresh." Prather confirmed that Hancock would be coming "sometime today," but he told the UC they would meet tomorrow.

On March 26, 2025, at approximately 3:19 p.m., Hancock was observed exiting his stash house, Anthem House, in Baltimore. At approximately 5:31 p.m., Hancock contacted Prather (TT1, Session 6457) and asked for Prather's location, to which Prather responded, "On Knox." Between approximately 5:35 p.m. and 5:39 p.m. (TT1, Sessions 6458-6460), Prather received three incoming calls from Hancock. All three calls went unanswered or to voicemail. At approximately 5:39 p.m., FBI technical and physical surveillance in the vicinity of the 2900 block of Knox Place SE observed a white BMW sedan, bearing Virginia license plate THF8884, parking across the street from 2926 Knox Place SE. Shortly thereafter, Hancock was observed exiting from the vicinity of the BMW and subsequently entering 2926 Knox Place SE. Hancock exited 2926 Knox Place SE at approximately 5:47 p.m. After interacting with several people on the block, Hancock entered the driver's seat of the BMW and departed the area.

### *August 26, 2025 Arrest and Takedown Operation*

On August 21, 2025, following the above-referenced indictment return, arrest warrants were issued for the defendant and seven coconspirators. On August 26, 2025, law enforcement

conducted a joint operation to execute the arrest warrants and residential warrants in 20 locations (including residences in Maryland and California), and several vehicular searches; the results were overwhelming, as reflected in the below table and photographic display.  Of relevance to this defendant are the two highlighted locations below—2926 Knox Place SE and his residence at 11235 Oak Leaf Drive, Apt. 1413, in Maryland.

| ADDRESS and/or VEHICLE | ASSOCIATIONS and/or DEFENDANTS PRESENT | EVIDENCE SEIZED[8] |
|---|---|---|
| 2926 Knox Place SE Apt. 102 | Prather | • Glock 42, s/n: ADAX016 (loaded/chambered)<br>• 32.94 grams of white chunky powder identified as cocaine and methamphetamine<br>• Mossburg model 88 12-gauge shotgun (loaded)<br>• 31.93 grams of PCP in glass vials<br>• 8.65 grams of fentanyl in a plastic bag<br>• 10.03 grams of cocaine or cocaine base in a plastic baggie<br>• 24.94 grams of fentanyl in a plastic baggie |
| 2474 Alabama Ave SE Apt. 101 | Prather | • Mylar bags containing suspected marijuana (total gross weight 968.1 grams)<br>• 55.95 grams of cocaine base in a plastic bag containing cocaine base<br>• 146.26 grams of fentanyl-laced counterfeit oxycodone pills stamped M-30 in a plastic bag |

---

[8] Unless otherwise noted, all weights for narcotics in this chart include packaging. Additionally, unless otherwise noted, when a particular substance is identified as a specific narcotic, this reflects the results of field testing and all results are considered preliminary pending final testing from the DEA Mid-Atlantic Laboratory.

| | | |
|---|---|---|
| | | • Revolver pistol (loaded)<br>• 56 grams of eutylone powder in a plastic bag<br>• Plastic bag containing white powder testing positive for cocaine, fentanyl and methamphetamine (total gross weight 74.02 grams)<br>• Large rock of cocaine base, weighing 261.59 grams<br>• $4,141 US Currency<br>• Mylar bags containing 142.79 grams of suspected marijuana<br>• Multiple bags containing, in aggregate, 1.5 kilograms of suspected marijuana<br>• Paper plate with white rock substance and copper balls (weighing 112.27 grams and pending testing) |
| 1949 Naylor Road SE Apt. 201 | Riley | • Taurus Handgun (loaded and chambered)<br>• Glock 21 handgun (loaded and chambered)<br>• AR Style Rifle (loaded and chambered)<br>• Pyrex measuring bowl with spoon and residue<br>• Baggie containing 33.8 grams of fentanyl (pending testing)<br>• Plastic bag containing 151.02 grams of cocaine (pending testing)<br>• Small baggies containing, in total, 227.58 grams of fentanyl<br>• Plastic bag containing 37.89 grams of cocaine base (pending testing)<br>• White brick of cocaine powder (pending testing), weighing 822.2 grams |

| | | |
|---|---|---|
| | | • Multiple digital scales<br>• Approximately $17,000 in US Currency |
| 4228 Benning Road NE, Apt. 102 | Edwards | • Backpack containing cocaine or cocaine base (pending testing)<br>• Approximately $8,250 in US currency<br>• Clear baggie containing 131.51 grams of cocaine base (pending testing), with accompanying scale<br>• 222.34 grams of marijuana in three bags<br>• Clear bag containing 335.96 grams of cocaine base (pending testing) |
| 2921 Knox Place SE Apt. 201 | Missouri | • 88.91 grams of fentanyl from open plastic bag near toilet<br>• 1.3 kilograms of marijuana in baggies within black backpack<br>• 140.36 grams of fentanyl in baggies within black backpack<br>• 290 grams of PCP, in vials, within black backpack<br>• Black Draco s/n PMD 10631-19 (loaded and chambered) |
| 1000 12th St SE Apt. 501 | Rawlings | • Taurus PT 738 S/N 15250D handgun with ammunition<br>• Taurus pistol G3C with ammunition<br>• 33.53 grams of cocaine in vial<br>• 43.24 grams of cocaine in assorted storage containers<br>• $14,208 in U.S. currency<br>• Vehicle search: 971.78 grams of PCP in vials, 81.22 grams of cocaine |
| Anthem House | Hancock | • Kilo pill press |

| 900 E Fort Ave, Apt. 816 | | |
| 11235 Oak Leaf Drive, Apt. 1413 | Lassiter | • Digital scale with white powder residue |
| 16613 Strategy Place | Thomas | • Approximately $26,000 in U.S. Currency<br>• 9mm handgun<br>• .22 caliber derringer pistol<br>• Money counter<br>• Can sealer and cans<br>• Samples seized from possible PCP processing equipment |

These recoveries exemplify the risk of harm to the community that flows from the defendants' ready access to firearms and fatal drugs.



**ARGUMENT**

The United States respectfully submits there is no condition or combination of conditions adequate to reasonably assure the community's safety. Therefore, the Court should affirm Magistrate Judge Harvey's order holding the defendant without bond pending trial.

A.    The Nature and Circumstances of the Offense

As Magistrate Judge Harvey found, this factor weighs strongly in favor of detention.  The grand jury found by probable cause that the defendant and his coconspirators engaged in a drug trafficking conspiracy, since July 2024, to distribute substantial quantities of fentanyl and PCP.

The defendant's operations with Prather and the coconspirators essentially commandeered an entire portion of a local community in D.C. and therein established an open-air drug market. Indeed, the gravity of the charges against the defendant is reflected in his exposure to a steep period of incarceration—to wit, for the narcotics conspiracy charge, the defendant faces a mandatory-minimum sentence of ten years and up to life in prison, under 21 U.S.C. § 841(b)(1)(A)(iv) and/or (vi).

The severity of the defendant's sentencing exposure is informed by the dangers concomitant with the proliferation of fentanyl, which is notorious for devasting local communities, causing overdose deaths (particularly fentanyl), and provoking violence. *See, e.g., United States v. Glasglow*, 2021 WL 2403136, at *7 (D.D.C. Jun. 11, 2021) (Lamberth, J.) (noting that two milligrams of fentanyl can be fatal).

Fentanyl is a potent synthetic opioid approved by the Food and Drug Administration for use as an analgesic (pain relief) and anesthetic. It is approximately 100 times more potent than morphine and 50 times more potent than heroin as an analgesic.[9]  As reflected in the statutory mandatory minimums for fentanyl distribution, Congress recognized the danger of this particular drug, which is responsible for a national opioid crisis resulting in a considerable increase in fatalities.  The statistics regarding the dangers of fentanyl, and its impact in Washington D.C., are

---

[9]    Drug Enforcement Administration, Fentanyl Fact Sheet, https://www.dea.gov/factsheets/fentanyl, (last visited August 28, 2025).

staggering. A report issued by the D.C. Office of the Chief Medical Examiner ("OCME"), dated September 19, 2024, shows opioid-related overdoses increased dramatically from 2014 until 2023. As discussed in the report, in 2023, there were 523 opioid-related fatal overdoses with an average of 43 deaths per month.[10]  While the term "opiates" include fentanyl and its analogs, morphine, heroin, and other types of drugs, the OCME also discovered that in 2023, over 96% of these overdose deaths involved fentanyl.[11]  Beyond D.C., fentanyl continues to have a devastating impact on the local and national community.  According to the Drug Enforcement Administration, "[m]ore than 107,000 people lost their lives to a drug overdose in 2023, with nearly 70 percent of those deaths attributed to opioids such as fentanyl."[12]

B.     **The Weight of the Evidence Against the Defendant**

The defendant argues, absent discovery, he is unable to adequately engage with the second factor of the 3142(g) analysis.  *See* Appeal at 4.  The discovery in a case of this magnitude entails *terabytes* of data.  On September 1, 2025, the United States contacted all defense counsel in this matter, requesting their position on a proposed protective order governing sensitive discovery materials.  In the same correspondence, the United States requested that each defense counsel provide the undersigned with four terabyte hard drives to house an initial discovery production. As of the date of this filing, the United States has neither received a hard drive nor the defendant's

---

[10] *See* D.C. Office of the Chief Medical Examiner, Opioid-related Fatal Overdoses: January 1, 2018 to June 30, 2024 (September 19, 2024), https://ocme.dc.gov/sites/default/files/dc/sites/ocme/Opioid-Related%20Fatalities_Sep2024.pdf (last visited July 16, 2025).

[11] *Id.*

[12] Drug Enforcement Administration, Overdose Deaths Decline, Fentanyl Threat Looms (December 16, 2024), https://www.dea.gov/press-releases/2024/12/16/overdose-deaths-decline-fentanyl-threat-looms#:~:text=More%20than%20107,000%20people%20lost,to%20opioids%20such%20as%20fentanyl. (last visited July 16, 2025).

response concerning his position on the proposed protective order, which must be issued prior to the provision of discovery.

On the merits, the defendant contends he played a "limited and sporadic role" in the charged drug conspiracy. *See id.* at 3. Far from it. The mountain of evidence summarized *infra* and detailed during the September 2 detention hearing show the defendant was Prather's right-hand man in the conspiracy, co-manager of the primary stash house at 2926 Knox Place SE, and an intermediate supplier to Prather of bulk fentanyl.

For the sake of brevity, the United States detailed in its Omnibus Memorandum in Support of Detention [ECF No. 16], the evidence underlying only the controlled buys charged in Counts 3 through 8. However, the defendant supplied or facilitated a fentanyl supply to Prather for at least twelve of the eighteen controlled buys with Prather—including on September 11 and 24, 2024; October 3, 15, and 23, 2024; November 12 and 20, 2024; December 3, 2024; January 8, 2025; February 11 and 26, 2025; and March 27, 2025. The approximate quantity of fentanyl sold in just those twelve controlled buys was 689.46 grams. Of course, this quantity does not even account for the fentanyl the defendant provided Prather for sale to members of our community.

On September 11, 2024, the defendant was the first identified coconspirator and upstream source of fentanyl supply to Prather. On September 11, 2024, when the UC entered 2926 Knox Place SE, he met Prather inside the building and requested 20 grams of fentanyl, but Prather relayed he did not have enough in that moment to complete the order, so he called the defendant a few times, as reflected by Prather's call detail records. At 10:51 a.m., when Prather called the defendant in the presence of the UC and placed the call on speaker phone, the UC's recording device captured the defendant saying, "I'm on my way to the house right now to get it and head to you," estimating an 11:15 a.m. arrival. Around 11:32 a.m., surveillance on the 2900 block of Knox

Place SE showed the defendant's Hill-Rom Chevrolet work van arriving. The defendant, wearing his work uniform, entered the 2926 Knox Place SE building where Prather and the UC were waiting. The defendant and Prather then together entered Prather's stash location at Knox Place, Apartment 101, leaving the UC waiting in the common area. Once Prather returned to the common area where the UC was standing, Prather weighed the requested fentanyl and completed the sale with the UC while the defendant remained in the doorway of Apartment 101, as reflected in the image below.



For each of the remaining eleven controlled buys involving the defendant, a similar pattern unfolded—after the UC called Prather to schedule a controlled purchase of fentanyl, call detail records showed Prather calling the defendant, consistent with coordinating a resupply of fentanyl before the scheduled buy. The defendant's CSLI corroborated by surveillance, showed the defendant arriving at 2926 Knox Place SE to drop off the supply in time for Prather's controlled purchase with the UC. Once Prather's phone communications were intercepted, starting on February 5, 2025, the calls exchanged between Prather and the defendant corroborated precisely

what circumstantial evidence suggested—that the defendant managed the 2926 Knox Place SE stash house alongside Prather and further supplied Prather with fentanyl, including fentanyl from Hancock, which was stored at Hancock's stash house and primary residence, the Anthem House in Baltimore, Maryland.

*October 23, 2024 buy (Count 3)*:

As detailed above, the defendant supplied the fentanyl for the UC's October 23, 2024 purchase of 57.60 grams of fentanyl, transporting it from Hancock's Baltimore stash house to D.C. for Prather to sell the UC. This is corroborated by the defendant's CSLI showing his device in the vicinity of Anthem House in Baltimore, Maryland before surveillance showed the defendant leaving Anthem House around 8:22 a.m. CSLI showed him traveling to D.C. while toll records reflected his and Prather's numerous calls with one another. Around 11:09 a.m., Prather told the UC in a recorded call that, before completing the buy, he needed to "get it from my man" at Deanwood station. Sure enough, at 11:21 a.m., the defendant's CSLI showed him in the vicinity of Deanwood station (near the BP gas station on Kenilworth Avenue), approximately six minutes before Prather then called the UC at 11:27 a.m., saying he was on his way to meet the UC for the sale.

*November 12, 2024 buy (Count 4)*:

The defendant supplied Prather with the approximately 83.61 grams of fentanyl that Prather sold the UC for this buy. This is corroborated by CDR showing calls exchanged between Prather and the defendant from 5:23 a.m. and 5:28 a.m.; and pole camera footage capturing the defendant's arrival at Knox Place at 6:18 a.m. and him dropping something off in a Ford Fusion with no rear license plate, but on its front, the same license plate (MD 8AW9957) affixed to the defendant's Hill-Rom van. Surveillance at his work site later in the day recorded him wearing similar clothing

to what he wore at Knox Place around 6:18 a.m.  Pole camera also showed Prather retrieving what the defendant left in the Ford Fusion, while on his phone, which CDR reflected was Prather's phone call with the defendant.

*February 11, 2025 (Count 5)*:

As detailed *supra,* by the time of this controlled buy, Prather's TT1 intercepted communications confirmed the defendant's role in the conspiracy as his comanager of Prather's stash house in D.C. and supplier of fentanyl in coordination with Hancock.  Once the UC requested the purchase the day before the scheduled buy, Prather and the defendant spoke by phone, and Prather confirmed that the defendant still had the "purple rain," referencing the powdered fentanyl ultimately sold to the UC, which was noticeably purple in color.  Later that evening, the defendant called Prather (TT1, Session 733) to say, "we locked the trap up" before talking about the effect the purple rain had on their tester, Darren, who the defendant described was "fried on the new shit we gonna have."  The defendant mentioned that Prather should check in on Darren when he's there because the defendant locked Darren in.  Prather confirmed he would.  On the date of the buy, law enforcement intercepted Prather's call with the defendant when Prather confirmed with the defendant the meeting time with the UC; in response, the defendant advised that he himself would be back at Knox around 1.

*February 13, 2025 Visit to Anthem House*:

On February 13, 2025, the defendant's CSLI reflected his presence in the area of Hancock's stash house, the Anthem House in Baltimore, Maryland, where Hancock resided in Apartment 816. The covert camera installed at Hancock's stash house showed the defendant entering Apartment 816, at approximately 4:13 p.m.  At approximately 5:33 p.m., the defendant called Prather on TT1, and they discussed the following:

LASSITER: Oh I was . . .I Uhmm... Nah I was calling I been around there earlier today, I just came down the way to put some shit together…...but I locked the house back up tho.

PRATHER: I need one, I ain't had none.

LASSITER: I know I know that's why I was calling, cuz I went in the house, before I left, I locked everything up, uh put the money on the table and shit like that I made up there, and then I, rolled out but I'm boutta uh head back up that way.

The covert camera showed the defendant then leaving Apartment 816 at approximately 5:38 p.m., immediately after having concluded the above call with Prather. The defendant's CSLI showed him leaving that area around 6:00 p.m. and driving towards Washington, D.C., arriving at the 2900 block of Knox Place around approximately 7:22 p.m. Pole camera on Knox Place showed the defendant entering the trap house building on Knox Place. At 8:03 p.m, the defendant called Prather, asking where he was, and advising that he was upstairs; Prather responded that was walking into the building. Put simply, the intercepted communications between Prather and the defendant revealed that the defendant was at Hancock's stash house in Baltimore to obtain a resupply before heading back to the Knox Place stash house, where he met Prather later that evening.

### February 26, 2025 (Count 6):

Once again, intercepted communications crystallized the defendant's role as a coconspirator and fentanyl supplier to Prather. Intercepted communications between the defendant and Prather from the morning of the buy included Prather's request of the defendant for 3 ounces of fentanyl and their coordination of when and where they would meet before Prather planned to meet the UC. Surveillance showed the defendant's arrival in his Hill-Rom work van at the 2900 block of Knox Place around 11:52 a.m. He left soon thereafter, around 12:30 p.m.

### March 27, 2025 (Count 7):

As detailed above, Prather turned to the defendant to provide the 2 ounces of fentanyl prior

to the controlled buy.  This time, the defendant personally was unable to complete the supply, so he instructed Prather to get with Hancock, a/k/a "Fresh" for the fentanyl.  Ultimately, Hancock coordinated with Prather to drop off the fentanyl at Knox Place around 5:39 p.m. on March 26, 2025.  The next morning, the defendant called Prather to confirm he was able to get the fentanyl from "Fresh" and instructed Prather to weigh it and mix it, observing that there "will be some purple shit on top."

*Intercepted Communications Generally and Recently Acquired Evidence*

Beyond the TT1 intercepted communications evincing the defendant supplied Prather with fentanyl before the controlled buys, they further revealed his role in comanaging the stash house at 2926 Knox Place SE.  The defendant and Prather frequently contacted one another to discuss the day-to-day operations of the stash house.  By way of example, the defendant and Prather discussed:  confirmation that the stash house was locked, the effect of their narcotics on a tester, requests to check on a tester at the stash location, where within the stash location they left the money, where to locate an item within the stash house, cords running through the trap house that could draw the rental office's attention, an incident when someone stole from the trap house because Prather left the door open, police presence near the stash house and the movement of narcotics from the stash location to avoid seizure, etc.

During the interception period, and consistent with the intercepted communications, pole camera footage and the defendant's CSLI showed the defendant frequenting 2926 Knox Place SE stash house, which is not his residence.  Further, his CSLI and pole camera footage showed he continued to frequent that stash location after the TT1 interception period concluded.  Indeed, according to his CSLI data, in August 2025, the defendant visited 2926 Knox Place SE every day from August 3 to the conclusion of the collection of his ping data on August 15, 2025.

What's more, the evidence seized on August 26, 2025, from the 2926 Knox Place SE stash house comanaged by the defendant—including multiple loaded firearms and a variety of distribution-quantities of narcotics—evinces the continued operations of the narcotics trafficking conspiracy up until the date of the takedown operation.

### C.    The History and Characteristics of Each Defendant

The United States acknowledges this factor weighs in the defendant's favor, although it is not dispositive.   The defendant's criminal history is minor with only one prior arrest.   Importantly, however, his criminal history does not fully capture the nature of the defendant's role in the conspiracy.   His conduct was ongoing and continuous.   He persistently participated in the conspiracy's goals, and he was one of its key members—high within its hierarchy. And unfortunately, his remarkable educational and employment history were insufficient to steer the defendant from this role within the conspiracy.

In sum, while this factor does not weigh in favor of detention, it does suggest that the charged conduct is not aberrational for the defendant.

### D.    The Nature and Seriousness of the Danger to Any Person or the Community Posed by the Person's Release

The United States respectfully submits that the defendant poses a significant danger to the community.   The presumption under Section 3142(e)(3)(A) establishes that narcotics trafficking is an "inherently dangerous activity."   *See United States v. Bethea*, 763 F. Supp. 2d 50, 54 (D.D.C. 2011) (Lamberth, C.J.).   Here, the danger is magnified where the narcotics trafficked *in substantial quantities* includes fentanyl.

Further amplifying the danger is the confluence of firearms with narcotics trafficking, which renders the areas afflicted by the defendant's conduct vulnerable to gun violence, among other ills.   Specific to this indictment, these dangers are not hypothetical, nor are they generalized

as it relates to the area in and around the 2900 block of Knox Place SE.  Put simply, the danger the defendant poses to the community cannot be understated, nor can it be mitigated by release conditions.

**CONCLUSION**

For the aforementioned reasons, the United States respectfully requests that the Court affirm the judgment of Magistrate Judge Harvey and hold the defendant without bond pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Sitara Witanachchi*
SITARA WITANACHCHI
JOHN PARRON
MATTHEW W. KINSKEY
D.C. Bar No. 1023007 (Witanachchi)
PA Bar No. 324503 (Parron)
D.C. Bar No. 1031975 (Kinskey)
Assistant United States Attorneys
Violent Crime and Narcotics Trafficking Section
601 D Street, NW
Washington, D.C. 20530

CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2025, a copy of the foregoing Opposition was submitted via CM/ECF, which will transmit to counsel for the above-captioned defendant.

*/s/ Sitara Witanachchi*
Assistant U.S. Attorney